# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

**JAMES H. VICKNAIR, SR.**                    **\*CIVIL NO. 6:11-0184 c/w 11-406,
11-407 and 11-834**

**VERSUS**                                      **\*JUDGE DOHERTY**

**LOUISIANA DEPARTMENT OF**                    **\*MAGISTRATE JUDGE HILL**
**WILDLIFE AND FISHERIES, ET AL.**

## REPORT AND RECOMMENDATION

The Motions for Summary Judgment filed by Sheriff Ronald J. Theriot ("Sheriff

Theriot") and Detective Gabriel Gauthier ("Detective Gauthier"), collectively, "the defendants"

[rec. doc. 13 in Civil Action No. 6:11-406 and rec. doc. 13 in Civil Action No. 6:11-407] have

been referred to the undersigned for Report and Recommendation.  Following discovery

limited to the issues raised in, or relevant to, the pending Motions[1], plaintiffs Ronald J.

Vicknair, Jr. ("Vicknair") and Bernard Blanchard ("Blanchard"), collectively, "the plaintiffs"

filed Opposition to the Motions [rec. doc. 42], to which the defendants filed a Reply. [rec. doc.

45].  Oral argument on the Motions was held and the Motions were taken under advisement.

For the following reasons, **IT IS RECOMMENDED** that all federal claims asserted by

Ronald J. Vicknair, Jr.  and Bernard Blanchard against Sheriff Ronald J. Theriot and Detective

Gabriel Gauthier  be **DISMISSED WITH PREJUDICE**, and all state law claims asserted by

Ronald J. Vicknair, Jr.  and Bernard Blanchard against Sheriff Ronald J. Theriot and Detective

Gabriel Gauthier  be **DISMISSED WITHOUT PREJUDICE**.

---

[1]*See* rec. doc. 38.

## BACKGROUND

The plaintiffs, Vicknair and Blanchard, are commercial crawfishermen.  In early February 2010, plaintiffs allege in their Complaints that they navigated from the Atchafalaya River into Lake Warner and placed their crawfish traps within the bed of the Lake, below the ordinary high water mark.  However, in early March 2010, when the waters of the Lake receded so that they could no longer navigate, they hung their traps in the same location where they had previously been set, to wait until the waters rose again in the spring.  (Complaints, ¶ 7 and 12-14).

In February, 2010, Detective Gauthier received a complaint that crawfish traps belonging to James Vicknair (apparently the plaintiff in consolidated action 6:11-184) had been stolen from an area near Lake Warner.  In connection with the theft complaint, on February 25, 2010, Deputy Gauthier obtained a statement from Brian Fritscher ("Fritscher") and James LaGrone ("LaGrone"), both of whom advised that the traps were on private property owned by Whiskey Bay Island, LLC ("Whiskey Bay"), of which they were owners, and that LaGrone found the traps on their property and had picked them up and piled them where they were publicly visible. (Affidavit of Detective Gauthier, ¶ 3, 5).

Detective Gauthier checked with the St. Martin Parish Assessor's Office, and it appeared to him that the Assessor's records showed that the crawfish traps were located on land owned by Whiskey Bay.  Detective Gauthier's investigative file regarding the alleged theft of James Vicknair's crawfish traps was turned over to the District Attorney's Office.  On March 12,

2010, Assistant District Attorney Renee Louviere ("Louviere"), by letter that same date, declined to prosecute charges. (*Id*. at ¶ 6-7).

In his affidavit submitted in support of the instant Motion, Detective Gauthier stated that he received a call from LaGrone on March 15, 2010 complaining that there were several crawfish traps on Whiskey Bay property.  Accordingly, that same date, Detective Gauthier met with LaGrone on the property.  After crossing the Pilot Channel and riding 4-wheelers across dry land, Detective Gauthier observed approximately thirty crawfish traps and marker flags generally clustered around two deer stands, each of which was located in a clearing in the woods, separated by a "food plot" or clearing about a half-mile long.

Using a GPS locator, Detective Gauthier recorded the latitude and longitude of each deer stand around which the crawfish traps were clustered.  Detective Gauthier advised LaGrone that he would confirm that the traps were located on Whiskey Bay property and, if so, would consult with the District Attorney about possible trespass charges.  Detective Gauthier then returned to his office and plotted the coordinates on Google Earth, which, like the Assessor's records, confirmed the property belonged to Whiskey Bay. (*Id.* at ¶8-14).

On March 16, 2010, Detective Gauthier states in his affidavit that he met with ADA Louviere about the situation.  Louviere agreed with Detective Gauthier that the property at issue was privately owned by Whiskey Bay and that the people setting the traps on the property without permission were trespassing.  Louviere provided Detective Gauthier with a similar case involving trespass by fishermen on Atchafalaya Basin swamp land, *State v. Barras*.  On

March 16, 2010, Detective Gauthier contacted LaGrone and advised LaGrone that if he wanted to clean-up his property, he could pick-up the crawfish traps on his property.  (*Id*. at ¶ 15-16).

The above facts and dates are mirrored in Detective Gauthier's Investigative Report of Criminal Trespass against Blanchard and Vicknair, prepared April 13, 2010 and submitted to the District Attorney on April 14, 2010. (Plaintiffs' Ex. B).

In his deposition taken on February 27, 2012, Detective Gauthier originally testified in accordance with the above dates – that he received a call from LaGrone on March 15, and took the GPS readings that same date.  (Deposition of Gauthier, pg. 64, 80).   Later in his deposition, Detective Gauthier testified that a document in his investigative file indicated that he met LaGrone on the Whiskey Bay property on the afternoon of March 12, 2010 and took the GPS coordinates on that same date.  Gauthier was not sure which date was correct; it was either March 12 or March 15.  (*Id*. at pg. 114-117).

Detective Gauthier testified that he met with ADA Louviere to discuss the case on March 16, 2010; Louviere advised that the owners of the traps had trespassed on Whiskey Bay property.  Thereafter Detective Gauthier told LaGrone that he could pick up the traps on his property.  (*Id.* at pg. 117-118, 121-122).  With respect to Whiskey Bay's ownership of the property, Detective Gauthier already had the information from the Assessor's Office and already had determined the location of the property on the Internet before he met with Louviere.  (*Id*. at pg. 123-124).

A handwritten note of LaGrone, produced by Whiskey Bay in discovery, indicates that the GPS readings of the "location of traps and tresspass [sic] activity" were taken on March 12, 2010.  The note also indicates that on March 15, 2010 "Detectives said we could remove traps and press trespass charges."  Finally, on March 15 and March 16, 2010, the note indicates that various persons, presumably Whiskey Bay members, picked up "traps at sites shown to St. Martin Detectives." (Plaintiffs' Ex. C).

It is undisputed that Detective Gauthier met with Louviere on March 12, 2010, the day she declined theft charges against LaGrone.  In her deposition, taken on February 27, 2012, Louviere could not definitely recall if Detective Gauthier asked about trespassing charges at that time, but, if he had not, she assumed that he would have come back a second time to ask about the issue. Based on the facts presented to her, Louviere told Detective Gauthier that, in her opinion, a trespassing violation had been committed, but that he, Detective Gauthier, might want to check with the State Lands Management Office to see if they had any designations on the property, to be sure.

While it is generally not Louviere's practice to say with one hundred percent certainty that a crime had been committed, Louviere recalled telling Detective Gauthier "Well, you know, I think you covered that it is trespassing." (Deposition of Louviere, pg. 33).

Louviere also gave Detective Gauthier case law on the issue.  Finally, Louviere testified that Detective Gauthier "may have" advised that he was going to tell the landowner that it was okay to pick up the traps based on information he received from her, and that she "could have" given her blessing, but that she did not know for sure. (*Id*. at pg. 34-35).

On March 19, 2010, LaGrone informed Detective Gauthier that he picked up approximately 200 crawfish traps from the Whiskey Bay property.  LaGrone told Detective Gauthier that these traps were "just clustered around" the area where the thirty traps he observed had been located.  (Deposition of Gauthier, pg. 123).  The traps remained with LaGrone on Whiskey Bay property.  Since the owners of the traps were unknown, an advertisement was run in the Teche News stating that abandoned crawfish traps had been recovered in the Basin, and providing a telephone number to call for information.  It is unclear whether LaGrone, or LaGrone in conjunction with Detective Gauthier, determined the wording of the advertisement.

Thereafter, LaGrone called Detective Gauthier to advise that Vicknair had responded to the advertisement.  LaGrone gave Vicknair's phone number to Detective Gauthier.  Detective Gauthier called Vicknair and Vicknair agreed to go to the Sheriff's Office to identify his traps.  Vicknair told Detective Gauthier that he would check his traps by pirogue when the water would drop by rowing his pirogue as far as he could, and then, when stopped by a ridge, exiting his pirogue and traversing over dry land until he could again enter his pirogue.

On March 29, 2010, Detective Gauthier again visited the Assessor's Office to again confirm the ownership of the property.  He also met with LaGrone to pick up a sample of each type of trap seized from the property, a total of five traps.  Detective Gauthier then met with Vicknair at the Sheriff's Office.  Vicknair identified two types of traps as his.  Detective Gauthier then read Vicknair his *Miranda* rights, and advised Vicknair that he would be cited

for trespassing. Vicknair provided a written statement and was issued a misdemeanor citation and summons for trespassing.  Vicknair left the Sheriff's Office.

Vicknair told Blanchard that he thought some of the seized traps belonged to Blanchard. Accordingly, on March 30, 2010, Blanchard went to the Sheriff's Office and identified one type of trap as his.  Detective Gauthier then advised Blanchard of his *Miranda* rights, and advised Blanchard that he would be cited for trespassing.  Blanchard provided a written statement and was issued a misdemeanor citation and summons for trespassing.  Blanchard told Detective Gauthier that he placed his traps on the property when the water was high.  However, because he could not pull his pirogue over dry land, Blanchard said that his practice was to leave his traps on the property when the water went down, and then return to retrieve the traps when the water rises.  Blanchard left the Sheriff's Office.

On March 31, 2010, Detective Gauthier received a copy of a State lands map from Larry Decker of the Louisiana State Lands Office.  Detective Gauthier had given Mr. Decker the GPS coordinates of the location of the two deer stands.  Mr. Decker had plotted those coordinates on a State lands map.  The map indicated that these coordinates did not fall on State land and, accordingly, were located on private property.  (Deposition of Detective Gauthier, pg. 136-137; Plaintiffs' Ex. B, Investigative Report, at pg. 4).

Detective Gauthier had no means of transporting the remaining traps to the Sheriff's Department.  Accordingly, on April 6, 2010, Detective Gauthier procured the use of a truck to transport these traps for pick-up by their owners.  (Deposition of Detective Gauthier, pg. 131-

7

132 and 152). That same day, he notified both Vicknair and Blanchard that they could come to the Sheriff's Office to retrieve their traps. On April 7, 2010, both Vicknair and Blanchard retrieved their traps.

## LAW AND ANALYSIS

**Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]

Rule 56(e) provides, in pertinent part, as follows:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)[3], the court may: . . . (3) grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it . . . .

The Motions for Summary Judgment are properly made and supported. Thus, the plaintiffs may not rest upon the allegations in their pleadings, but rather must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial.

---

[2]Rule 56 was revised, effective December 1, 2010, "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." *See* Committee Notes, Rule 56.

[3]Rule 56(c)(1) provides, in pertinent part, as follows:
> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986).  However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions and those supported by only a scintilla of evidence are insufficient.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Furthermore, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.  *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) *citing Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987);  *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir. 1992).   Moreover, summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 106 S.Ct. at 2552.

The plaintiffs have submitted evidence in opposition to the instant Motions.  However, this  evidence fails to demonstrate that there is a genuine issue of material fact.  Accordingly, summary judgment in favor of the defendants, Sheriff Ronald J. Theriot and Detective Gabriel Gauthier, on the plaintiffs federal claims is appropriate for the reasons which follow.

## I.  Qualified Immunity/Federal Law Individual Capacity Claims

Government officials are entitled to qualified immunity for civil damages if their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982);  *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In other words, qualified immunity is available when a

reasonable official would not have known that his actions would violate a constitutional right that was clearly established at the time of the incident. *Harlow*, 102 S.Ct. at 2738. Qualified immunity is not merely a defense to liability but an immunity from suit. *Swint v. Chambers County Comm'n*, 514 U.S. 35, 42, 115 S.Ct. 1203, 1208, 131 L.Ed.2d 60 (1995); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985).

Claims of qualified immunity require a two-step analysis. First, the court must determine whether the plaintiff has demonstrated that "the officer's conduct violated a constitutional right." *Mace v. City of Palestine,* 333 F.3d 621, 623 (5th Cir. 2003); *Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999) *citing Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). If there is no constitutional violation, the court's inquiry ends. *Mace,* 333 F.3d at 623. On Motion for Summary Judgment, this determination is not limited to the pleadings alone. Rather, the court must consider the pleadings as well as the summary judgment evidence. *Mace,* 333 F.3d at 624 fn. 7.

If the plaintiff properly pleads (and supports at the summary judgment phase) that he has sustained the deprivation of a constitutional right, the court must then decide whether the defendant's conduct was objectively reasonable in light of "clearly established" law at the time of the alleged violation. *Hall,* 190 F.3d at 696 *citing Siegert*, 500 U.S. at 231-232. This "second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident*,* and, if so, whether the conduct of the defendants was objectively unreasonable in the

10

light of that then clearly established law." *Estate of Sorrells v. City of Dallas,* 45 Fed. Appx. 325 (5th Cir. 2002) *quoting Hare v. City of Corinth, Miss.,* 135 F.3d 320, 326 (5th Cir. 1998); *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005).  The analysis "generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were clearly established at the time [the action] was taken . . ." in light of the information the officers possessed.  *Anderson*, 483 U.S. at 639-640; *Wagner v. Bay City, Texas*, 227 F.3d 316, 321 (5th Cir. 2000) *citing Anderson*, 483 U.S. at 640.

Thus, even if it is determined that the official's conduct was unconstitutional, that is, that the defendant violated the plaintiff's clearly established constitutional rights, the court must nevertheless decide whether the conduct was "objectively reasonable" and, if so, the defendant may still be entitled to qualified immunity.  *Kipps v. Callier,* 197 F.3d 765, 768-69 (5th Cir. 1999) (citations omitted).  "Qualified immunity thus protects an official whose conduct was objectively reasonable, even if the conduct infringed upon a constitutional right of the plaintiff." *Wagner*, 227 F.3d at 321 *quoting Gutierrez v. City of San Antonio,* 139 F.3d 441, 445 (5th Cir. 1998) *citing Anderson,* 483 U.S. at 641, 107 S.Ct. at 3040.

"The qualified immunity standard gives ample room for mistaken judgments . . . ." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  Thus, if officers of reasonable competence could disagree . . . immunity should be recognized." *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995); *Tarver*, 410 F.3d at 750.  Further, qualified immunity should be recognized "if a reasonable official would be left uncertain of the application of the [clearly established law] to the facts

confronting him."  *Hopkins v. Stice*, 916 F.2d 1029, 1030-1031 (5ᵗʰ Cir. 1990) *citing Anderson*, 107 S.Ct. at 3038.

While it is often appropriate to examine the qualified immunity inquiries sequentially, courts are vested with sound discretion in deciding which of the prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.  *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 818 (2009).  This is so because "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  *Id.* at 237. In such cases, it is appropriate to bypass the first step analysis and decide only whether the alleged right is clearly established.  *Id.* at 238.

On a motion for summary judgment based on qualified immunity, the burden falls on the plaintiff to rebut the defense "by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct.*" Gates v. Tex. Dept. of Protective & Regulatory Servs*., 537 F.3d 404, 419 (5ᵗʰ Cir. 2008).

## A. Fourth Amendment/ Seizure of the Person

The plaintiffs have a Fourth Amendment right to be free from illegal seizure of their persons.  Under the Fourth Amendment, "[a] person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through

means intentionally applied[.]" *Brendlin v. California*, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (citations and internal quotation marks omitted); *see also California v. Hodari D.*, 499 U.S. 621, 627–28, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (citations and internal quotation marks omitted)); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870 (1980) ("a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained.").

The Fifth Circuit has held that issuance of "[a] summons, coupled with [ ] additional liberty restrictions . . .  may constitute a seizure under the Fourth Amendment." *Evans v. Ball*, 168 F. 856, 861 (5th Cir. 1999).[4]  In *Evans*, the plaintiff was issued a summons to appear in court, coupled with the requirements that he obtain permission before leaving the State, report regularly to pretrial services, sign a personal recognizance bond, and provide federal officers with financial and identifying information. *Id.* at 860.  These restrictions were found sufficient to diminish the plaintiff's liberty enough to render him seized under the Fourth Amendment. *Id.* at 861.

However, when a suspect is neither arrested nor detained, but instead is merely summoned to appear in court to answer charges without additional restriction, there is no

---

[4] *Evans* was decided in the context of a § 1983 suit for malicious prosecution and to that extent was overruled by *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003), but the Circuit's discussion of when restrictions on a criminal defendant are so onerous as to constitute a "seizure" within the context of the Fourth Amendment remain valid and applicable.

13

cognizable Fourth Amendment claim.  *Gonzalez v. Brazeley*, 2009 WL 2411800, *6-7 (E.D. La. 2009) *citing Matherne v. Larpenter*, 54 F.Supp.2d 684, 686–87 (E.D. La. 1999) (in the context of a malicious prosecution claim); *Bielanski v. County of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim."); *Martinez v. Carr*, 479 F.3d 1292, 1299 (10th Cir. 2007) ("[T]he issuance of a citation, even under threat of jail if not accepted, does not rise to the level of a Fourth Amendment seizure . . . ."); *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3rd Cir. 2005) ("[T]here could be no seizure significant enough to constitute a Fourth Amendment violation . . . [when plaintiffs] were only issued a summons; they were never arrested; they never posted bail; they were free to travel; and they did not have to report to Pretrial Services."); *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (A requirement to appear in court "was no more burdensome than the promise to appear a motorist makes when issued a traffic citation") and *Britton v. Maloney*, 196 F.3d 24, 29–30 (1st Cir. 1999) (issuance of a summons requiring plaintiff to appear in court is insufficient to establish a Fourth Amendment seizure), *cert. denied*, 530 U.S. 1204, 120 S.Ct. 2198, 147 L.Ed.2d 234 (2000).

In this case, as acknowledged by plaintiffs in their Opposition[5], neither plaintiff was arrested, or even detained, by Detective Gauthier.  Both Vicknair and Blanchard went to the

---

[5]Plaintiffs state that "their persons were not detained or arrested. . . ." [rec. doc. 42, pg. 9].

Sheriff's Office on their own, they were never not free to leave, their freedom of movement was not restrained in any way.  Rather, both were merely informed that they would need to sign a statement acknowledging their ownership of the crawfish traps before the traps could be returned to them, and each was issued a summons for trespass, a misdemeanor violation.  After issuance of the summons, neither was subject to any restrictions of their liberty.  To the contrary, each was free to leave, and no conditions on their release were imposed. Accordingly, because the plaintiffs have not established a Constitutional violation, summary judgment based on qualified immunity is properly granted on any claim by the plaintiffs under the Fourth Amendment for seizure of their person or false arrest or detention.

## B. Fourth Amendment/ Seizure of the Traps

The plaintiffs have a Fourth Amendment right to be free from unreasonable seizure of their property.   A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).   However, the protection provided by the Fourth Amendment applies only to governmental action; the protection provided by the Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." *Jacobsen*, 466 U.S. at 113.  Only if a court concludes that a seizure by governmental actors has occurred will it then consider the seizure's

15

reasonableness.  *Soldal*, 506 U.S. at 71, 113 S.Ct. 538; *Freeman v. City of Dallas*, 242 F.3d 642, 649 (5th Cir. 2001).

Here, it is undisputed that Detective Gauthier did not seize the plaintiffs' crawfish traps. Rather, LaGrone seized the traps after having been advised by Detective Gauthier that he could remove the traps from his land.  Plaintiffs argue that Detective Gauthier and LaGrone conspired to seize the traps and charge plaintiffs with trespass, thereby seeking to impute the requisite governmental action to LaGrone's conduct.  While the Court has grave doubts that the plaintiffs have presented facts sufficient to show the existence of any such conspiracy, the Court need not decide this issue to resolve the instant Motions.[6]

The parties dispute whether there was probable cause to seize the traps, given the uncertainty of the exact date that Detective Gauthier spoke with Assistant District Attorney Louviere about the trespassing issue and the exact date that Detective Gauthier informed LaGrone that the traps could be removed from the property.  That issue also need not be resolved to decide the instant Motions.

Even assuming that the seizure of the traps was effected by governmental action and further assuming the  absence of probable cause, it is clear that the plaintiffs fail the second prong of the qualified immunity defense.  Specifically, the law as to whether the public (plaintiffs here) have the right to crawfish on this swamp land in the Atchafalaya Basin was not

---

[6]The plaintiffs offer conclusory allegations and ask the Court to draw sinister conclusions from the scantiest of facts.  At worst, it appears that Gauthier gave LaGrone legal advice as to the removal of the traps.  That alone does not implicate the Fourth Amendment.  *See Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 311 (6th Cir. 2005) (offering legal advice, even if the advice is wrong, does not implicate the Fourth Amendment).

clearly established at the time of the seizure of the plaintiffs' traps.  It remains not clearly established today.  Moreover, in light of the information possessed by Detective Gauthier, his conduct throughout this entire incident was objectively reasonable.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011) *citing Anderson,* 483 U.S. at 640.  A case directly on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. (citations omitted).  The constitutional question in this case falls far short of that threshold.

Whether the seizure of the plaintiffs' traps was unconstitutional depends on the status of the property from where the traps were seized.  Under Louisiana law, areas between the ordinary high and low water lines of a river, or, in the case where levees are present, within the levees of a river, normally constitute the banks of a river which are subject to public use, even if privately owned.  La.Civ.C. art. 456.

However, Louisiana law does not create a private right to fish on the privately owned banks of rivers.  The public use contemplated by Louisiana law is limited to navigational purposes, that is, use incidental to the navigable character of the water and its enjoyment as an avenue of commerce, purposes which do not encompass fishing. *Parm v. Shumate*, 513 F.3d 135, 145 (5th Cir. 2007) *citing* La. Civ.C. art. 452, cmt. b.

Further, some swamp land in the Atchafalaya is not subject to a public right to fish.  For example, privately owned flooded swamp land in the Atchafalaya between its levees, that is, privately owned land that is covered by water only a part of the year, is not subject to public use. *State v. Barras*, 615 So.2d 285, 287-288 (La. 1993).

Louisiana took title to all lands below navigable waters when it was admitted to the Union in 1812.  Thus, to the extent that lands were submerged in 1812, the right of the public to fish on these lands may be preserved.  *See Dardar v. Lafourche Realty Co., Inc.*, 985 F.2d 824, 826-827 (5th Cir. 1993).  However, to the extent that these lands constitute tidelands that are not seashore or sea bottoms, or are inland non-navigable water bodies or bottoms or swamp land subject to indirect tidal overflow, but not direct coastal ebb and flow, they may be privately owned.  *Id*. at 830.

Here, the record reveals that the crawfish traps which Detective Gauthier viewed were clustered around two deer stands, in an area Detective Gauthier described to Louviere as "flooded lands", not "on the bank of anything" but "much farther inland", which description is supported by photographs and Google Earth plots of the area submitted by the defendants. (Deposition of Louviere, pg. 34; Defendants' Exs. B and C; and Reply Exhibits).

It is undisputed that both Fritscher and LaGrone told Gauthier that this land belonged to Whiskey Bay; this land is registered in the St. Martin Parish Assessor's Office as belonging to Whiskey Bay.  It is further undisputed that the plot of the GPS coordinates taken by Detective Gauthier and LaGrone on Google Earth correspond with property owned by Whiskey Bay.

18

Moreover, it was the opinion of Louviere, a trained attorney, that the land had been the subject of a trespass, an opinion which necessarily requires that the land be privately owned.  Finally, Larry Decker of the Louisiana State Lands Office advised Detective Gauthier that the coordinates did not fall on State land and, accordingly, was on private property.

There is no evidence in the record supporting the plaintiffs' allegations in their Complaints that the events occurred on navigable waters, or that the land on which the crawfish traps were located was within the bed of Lake Warner, below the ordinary high water mark. (Complaints ¶ 6-8 and 14).  Nor is there any evidence in the record to support a finding of the status of land in 1812 (whether it was submerged under the waters of Lake Warner in 1812), the high or low water marks of water bodies or the existence of any levee in the area in question, nor anything to support that this area constituted a seashore or sea bottom, as opposed to an inland non-navigable water body or bottom or swamp land subject to indirect tidal overflow, but not direct coastal ebb and flow.

Without this proof, it is impossible for this Court to determine that the public legally had the right to crawfish on this swamp land in the Atchafalaya Basin, much less that this right was "clearly established" at the time the traps were seized.[7]

---

[7]The plaintiffs argue that some of the over two hundred traps seized might not have been in the same location as the thirty traps Detective Gauthier observed.  However, they present no competent evidence in support of this argument. Further, the uncontradicted record evidence establishes that the traps seized by Lagrone were all "clustered around" the area of the two deer stands, the coordinates of which were taken by GPS and plotted by Detective Gauthier on Google Earth. (Deposition of Gauthier, pg. 123).

Moreover, even if the law was clearly established in plaintiffs' favor, Detective Gauthier's qualified immunity must be recognized because "a reasonable official would be left uncertain of the application of the [clearly established law] to the facts confronting him." *Hopkins v. Stice*, 916 F.2d 1029, 1030-1031 (5th Cir. 1990) *citing Anderson*, 107 S.Ct. at 3038.

Finally, on the record before this Court, it is clear that Detective Gauthier's actions were objectively reasonable.  He was confronted with the statements of two persons, Fritscher and LaGrone, that the land on which the crawfish traps were located was privately owned.  He had obtained information from the Assessor's Office confirming that to be the case.  Moreover, while the exact date that the GPS coordinates were obtained is disputed (either March 12 or March 15), it is clear that the coordinates plotted by Detective Gauthier on Google Earth confirmed the private ownership of the land, before the traps were seized.

Additionally, Detective Gauthier was obviously aware of the fact that the District Attorney had refused to accept charges against LaGrone for the complained of theft of James Vicknair's traps because the traps had been placed on the land illegally in the first instance.

Finally, while there is dispute as to when ADA Louviere advised Detective Gauthier that it appeared a trespass had occurred, this fact nevertheless supports the reasonableness of Detective Gauthier's actions because Louviere confirmed Gauthier's evaluation of the facts, as did the information which Gauthier later obtained from Larry Decker of the Louisiana State Lands Office.

Indeed, there is an absolute lack of any competent evidence suggesting that Detective Gauthier acted unreasonably.  As such, Detective Gauthier is qualifiedly immune from suit and summary judgment on this basis is properly granted.[8]

The plaintiffs also argue that the retention of their crawfish traps for approximately ten days after they had admitted ownership of the traps was constitutionally impermissible. However, for the reasons which follow, Detective Gauthier is likewise entitled to qualified immunity on this claim.

The touchstone of the Fourth Amendment is reasonableness. *United States v. Battiste*, 343 Fed. Appx. 962, 965 (5th Cir. 2009);  *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).  While the length of the detention of property may render a seizure of property unreasonable, the Fifth Circuit has repeatedly held that retention of property for periods well in excess of the ten days complained of here does not expose law enforcement officers to liability.  *Lindsay v. City of Beeville*, 288 Fed. Appx. 982, 984 (5th Cir. 2008) (seizure and retention of money for over a year not unreasonable) *citing Wren v. Towe,* 130

---

[8]As noted above, the parties argue as to whether probable cause for the seizure of the crawfish traps existed, an inquiry which is undertaken with respect to the first prong of the qualified immunity analysis, that is, whether the plaintiffs sustained a Constitutional violation.  Even if this Court found that the traps had been seized without probable cause, summary judgment on the basis of qualified immunity would nevertheless still be proper.  Law enforcement officers who reasonably, but mistakenly, conclude that probable cause is present are entitled to qualified immunity.  *Haggerty v. Texas Southern University*, 391 F.3d 653, 656 (5th Cir. 2004) *citing Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) and *Anderson*, 107 S.Ct. at 3039-3040; *Hunter v. Bryant*, 502 U.S. 224, 227-229 (1991).  Thus, when "arguable" probable cause is present, qualified immunity is not defeated.  *Id. citing Brown v. Lyford,* 243 F.3d 185, 190 (5th Cir. 2001).  At a minimum, at least arguable probable cause existed for the seizure of the crawfish traps.  Moreover, under the totality of the circumstances, in accordance with the above analysis, any mistake on Detective Gauthier's part as to whether probable cause was present was reasonable.

F.3d 1154, 1159-60 (5th Cir. 1997) (withholding property for several months after owner's legitimate claim to it had been established did not expose officers to liability) and *Bigford v. Taylor,* 896 F.2d 972, 975 (5th Cir. 1990) and 834 F.2d 1213 (5th Cir. 1988) (officer entitled to qualified immunity despite continued seizure of vehicle that lasted over three years without probable cause for the initial seizure).

Indeed, even the case cited by the plaintiffs in support of their argument, *Louisiana Farms v. Louisiana Dept. of Wildlife & Fisheries*, 685 So.2d 1086, 1102-1103 (3rd Cir. 1997), recognized that the seizure of property by officers for a few days while collecting evidence believed integral to the purported violations, and for a reasonable period of time to handle and process administrative matters, is permissible.

Furthermore, reasonableness is measured in objective terms by examining the totality of the circumstances. *Battiste*, 343 Fed. Appx. at 964, *Robinette*, 519 U.S. at 39. In this case, over two hundred crawfish traps were seized. With the exception of five traps picked up by Detective Gauthier for identification by the claimants, these traps were not at the Sheriff's Office; rather, they remained with LaGrone on the Whiskey Bay property. It is undisputed that Detective Gauthier had no means of transporting the traps to the Sheriff's Department. (Deposition of Detective Gauthier at pg. 131-132). Accordingly, once the owners of the traps identified themselves, Detective Gauthier procured the use of a truck to transport the remaining traps for pick-up by their owners. (*Id*. at pg. 132 and 152).

Given the physical inability of Detective Gauthier to immediately transport the traps, and further given that this nine day period encompassed the Easter holidays, this Court cannot find the delay was unreasonable.  This is particularly true given that there is no evidence to suggest that the plaintiffs offered any alternative means to directly retrieve their traps or that either Detective Gauthier or the Sheriff's Department prevented the plaintiffs from doing so.

In sum, because the length of time the plaintiffs' traps were retained after their ownership had been established was reasonable, plaintiffs have not established a Fourth Amendment violation.

## C.  Fifth Amendment/*Miranda* Rights and Sixth Amendment Right to Counsel

Plaintiffs claim that they were deprived of their Fifth Amendment rights when Detective Gauthier tricked or coerced them into confessing to trespass.

The Fifth Amendment's privilege against self incrimination is violated only at trial when a person's improperly obtained confession is actually used against him in a criminal prosecution.  *See Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994 (2003); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264, 110 S.Ct. (1990);  *Murray v. Earle*, 405 F.3d 278, 285 and fns. 11 and 12 (5th Cir. 2005) ("The Fifth Amendment privilege against self-incrimination is a fundamental trial right which can be violated only *at* trial, even though pre-trial conduct by law enforcement officials may ultimately impair that right.") (emphasis in original); *Holt v. Jefferson Parish Sheriff's Office*, 2007 WL 4114357, *4 (E.D. La. 2007).  Here, it is undisputed

that the plaintiffs' confessions were never used against them at any criminal trial.[9]

Accordingly, the Fifth Amendment was not violated.

Furthermore, the failure by Detective Gauthier to give timely *Miranda* warnings (even if true) does not implicate the Fifth Amendment. The *Miranda* warnings safeguard the right against self incrimination, but are not themselves rights protected by the Constitution. *See Chavez*, 538 U.S. at 772; *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357 (1974). Accordingly, because the failure to give *Miranda* warnings does not violate the Constitution, such failure cannot constitute grounds for a § 1983 action. *See Chavez*, 538 U.S. at 772; *Smart v. United States*, 2010 WL 4929107, *9 (W.D. Tex. 2010); *Craig v. St. Martin Parish Sheriff*, 861 F.Supp. 1290, 1297 (W.D. La. 1994) (recognizing that "the remedy for a violation of a suspect's *Miranda* rights is the exclusion from evidence of any compelled self-incrimination, not a civil rights action under 42 U.S.C. § 1983").

Likewise, plaintiffs have no claim for any Sixth Amendment violation. The Sixth Amendment right to counsel does not attach until a formal judicial criminal proceeding has been initiated. *See Kirby v. Illinois*, 406 U.S. 682, 689-690, 92 S.Ct. 1877 (1972); *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977); *Craig*, 861 F.Supp. at 1298. At the time that the plaintiffs were questioned by Detective Gauthier, it is clear that

---

[9]The plaintiffs note that the confessions were introduced at suppression hearings. However, the introduction of the challenged confessions during a hearing on Motions to Suppress filed by the defendants does not constitute the use of the confession against the defendant in a criminal trial. To the contrary, during a suppression hearing the defendant uses the confession to his benefit to defeat the criminal prosecution. Moreover, the statements were only used because the plaintiffs filed the Motion in their criminal case. In short, the plaintiffs caused the use of their statements.

formal judicial criminal proceedings had not been initiated, therefore the Sixth Amendment right to counsel had not attached.[10]

In sum, no violation of the plaintiffs Fifth or Sixth Amendment Constitutional rights occurred.

## D. Equal Protection

The equal protection clause essentially directs that all persons similarly situated be treated alike. *See City of Cleburne, Texas v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1989). To state an equal protection claim a plaintiff must allege, *inter alia*, that similarly situated individuals were treated differently. *Stoneburner v. Secretary of the Army*, 152 F.3d 485, 491 (5th Cir. 1998) *citing Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992); *Wheeler v. Miller,* 168 F.3d 241, 251 (5th Cir. 1999); *Piotrowski v. City of Houston,* 237 F.3d 567, 578 fn. 15 (5th Cir. 2001).

Ordinarily equal protection claims are premised on allegations of class-based discrimination. *Wheeler*, 168 F.3d at 252.  Thus, a plaintiff must also allege purposeful or intentional discrimination motivating the state action which caused the complained-of injury. *Stoneburner*, 152 F.3d at 491 *citing McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Piotrowski,* 237 F.3d at 578 fn. 15 (citations omitted).

---

[10] Under the Fifth Amendment, however, a detainee subject to custodial interrogation has the right to counsel. *Craig*, 861 F.Supp. at 1298 *citing Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  In this case, however, the plaintiffs were not detainees and there was no custodial interrogation.  Even if there had been a custodial interrogation, there is no § 1983 remedy for the alleged violation.  *Craig*, 861 F.Supp. at 1298 *citing Warren v. City of Lincoln, Nebraska*, 864 F.2d 1436, 1442 (8th Cir.), *cert. denied*, 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989).

Here, plaintiffs fail to demonstrate that they were treated differently than similarly situated persons.  To the contrary, the record reveals that plaintiffs, who are undisputably similarly situated, were treated exactly alike, that is, after admitting that each placed crawfish traps on the property at issue, each received a misdemeanor summons for trespass and their traps were returned.

Plaintiffs argue that fellow crawfisherman James Vicknair was treated differently from them because he was not criminally prosecuted for trespass, and also that there was "little emphasis placed on prosecuting LaGrone for theft, but there was a full blitzkrieg on the plaintiffs for trespass."

It is clear, however, that James Vicknair is not similarly situated to plaintiffs.  Unlike plaintiffs, James Vicknair did not go to the Sheriff's Department to claim ownership of any confiscated traps, thereby admitting placement of the traps on the subject property, nor did he sign any acknowledgment to that effect.  Thus, he was not a suspect in the trespass investigation.  Further, LaGrone testified that when he spoke with Detective Gauthier the first time, on February 25, 2010 LaGrone said he did not want to pursue trespass charges against James Vicknair.  (Deposition of LaGrone, pgs. 48-49).  This testimony is corroborated by Detective Gauthier, who testified that LaGrone did not want to pursue trespass charges, he just wanted James Vicknair to stay off his property.  (Deposition of Detective Gauthier, pg. 153).

Obviously, LaGrone is not similarly situated to the plaintiffs.  There is no evidence to suggest that LaGrone is a crawfisherman like the plaintiffs, and the crime which LaGrone allegedly committed, theft, is not the same as that allegedly committed by plaintiffs, trespass.

Finally, the initiation, extent and/or lack of prosecution is the responsibility of the District Attorney's Office, not the investigating officer.  Thus, any disproportionality cannot be attributed to the defendants herein.

Even if there was a sufficient showing of disparate treatment, which there is not, the plaintiffs have failed to demonstrate that the complained of actions were motivated by any purposeful or intentional discrimination against them based on an impermissible classification. Indeed, plaintiffs do not even make any allegations which would support an inference of purposeful or intentional discrimination which played any part in the actions taken against them, much less that any such discrimination was based on any impermissible classification.[11]

Finally, to the extent that plaintiffs are alleging a selective prosecution or enforcement claim, that claim is meritless.  To successfully bring a selective prosecution or enforcement claim, a plaintiff must prove that the government official's acts were motivated by an unjustifiable standard such as race, religion, the desire to prevent the exercise of a constitutional right or other arbitrary classification.  *Allred's Produce v. United States Department of Agriculture*, 178 F.3d 743, 748 (5th Cir. 1999) *citing  Oyler v. Boles*, 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Bryan v. City of Madison, Mississippi*, 213 F.3d 267, 277 (5th Cir. 2000).  As they have presented no proof that improper considerations motivated Detective Gauthier, the plaintiffs' equal protection claim fails.

---

[11]While plaintiffs suggest that they have had insufficient opportunity to discover "the nature and reason for the differential treatment", that argument is unavailing.  After the filing of these Motions, this Court granted the plaintiffs' motion to continue the hearing on the motions and delayed the deadline for the filing of opposition to allow discovery "on issues raised in, or relevant to, the pending Motions for Summary Judgment. . . ." [rec. doc. 38].  The plaintiffs therefore had ample opportunity to discover any basis on which an equal protection claim could proceed, but failed to do so.

The plaintiffs have not established any viable Equal Protection claim as a result of Detective Gauthier's alleged actions or inactions.

## E.  Substantive Due Process

The Supreme Court has long recognized that the Due Process Clause is more than a guarantee of procedural fairness and "cover[s] a substantive sphere as well, 'barring certain government actions regardless of the fairness of the procedures used to implement them.' " *County of Sacramento v. Lewis*, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) *quoting Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).  The Supreme Court, however, has repeatedly emphasized that courts should be "reluctant to expand the concept of substantive due process . . ." in large part because "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended . . . . "  *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Washington v. Glucksberg*, 521 U.S. 702, 117 S.Ct. 2258, 2267-2268, 138 L.Ed.2d 772 (1997);  *Chavez*, 538 U.S. at 775.

The reach of substantive due process is, accordingly, limited and it protects against only the most serious of governmental wrongs.  *See Lewis*, 523 U.S. at 846 *quoting Collins*, 503 U.S. at 129 ("only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'" and thereby a violation of substantive due process.). Conduct sufficient to shock the conscience for substantive due process purposes has been described in several different ways.  It has been described as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional

ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.*" Doe ex rel Magee v. Covington County School District ex rel Keys*, 675 F.3d 849, 867 (5th Cir. 2012) *citing  Lewis*, 523 U.S. at 846–47 & n. 8, 118 S.Ct. 1708 (citation and internal quotation marks omitted).

In the context of law enforcement, the requisite conduct proscribed by the substantive due process clause has been described as that which "shocks the conscience" when the conduct is "brutal and offensive to human dignity" and is among the "most egregious official conduct." *United States v. Fernandez*, 559 F.3d at 303, 330 (5th Cir. 2009) *citing  Stokes v. Gann*, 498 F.3d 483, 485 (5th Cir. 2007) (citation omitted).   As the Fifth Circuit recently summarized, "[t]he burden to show state conduct that shocks the conscience is extremely high, requiring stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even violations resulting from bad faith to something more egregious and more extreme." *Doe,* 675 F.3d at 868 *citing J.R. v. Gloria,* 593 F.3d 73, 80 (1st Cir. 2010).

The undersigned finds that Detective Gauthier's actions in obtaining confessions from each plaintiff does not rise to the extremely high level of outrageous or egregious conduct necessary to sustain a substantive due process violation.  To the contrary, even when the evidence is viewed in the light most favorable to plaintiffs, when compared to those cases in which that standard has been successfully reached,[12] the conduct at issue in this case falls far

---

[12] As the Fifth Circuit recently noted, most cases that have applied the standard have involved the use of extreme force by police officers or other state actors. *Doe,* 675 F.3d at 868 *citing Checki v. Webb*, 785 F.2d 534, 535–36, 538 (5th Cir. 1986) (state trooper intentionally used his vehicle to terrorize

below the Constitutional minimum.  Detective Gauthier's investigative technique simply cannot be said to be "so brutal and so offensive to human dignity" that it "shocks the conscience."[13]

Plaintiffs have cited no cases where similar investigative techniques where found sufficiently conscience-shocking so as to violate a plaintiff's substantive due process rights; no such case is known to the Court.

---

motorist and passenger), *Shillingford v. Holmes*, 634 F.2d 263, 264–65 (5th Cir. 1981) (police officer intentionally struck tourist because he was photographing the police officer and fellow officers apprehending a boy on the street during a Mardi Gras parade), *abrogated on other grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993), *Neal ex rel. Neal v. Fulton Cnty. Bd. of Educ.*, 229 F.3d 1069, 1071, 1075–76 (11th Cir. 2000) (student blinded in one eye when a coach intentionally hit him in the head with a metal weight), *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 797 (8th Cir. 1998) (rape of a woman at her house by a police officer after he stopped her for a traffic violation), and *Hemphill v. Schott*, 141 F.3d 412, 418–19 (2nd Cir. 1998) (police officer provided assistance to a third party in shooting the plaintiff).

[13]*See Stokes*, 498 F.3d at 485 (recognizing qualified immunity of a Mississippi Department of Wildlife, Fisheries, and Parks employee who had allegedly entrapped the plaintiff into the offense of taking deer at night by head-lighting because the conduct was not sufficiently egregious) *citing Rochin v. California*, 342 U.S. 165, 172-74, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping); *Stoot v. City of Everett*, 582 F.3d 910, 928-929 (9th Cir. 2009) (use of improper promises and threats to overcome the will of a developmentally delayed young boy in the absence of any injury, torture or mistreatment insufficient) distinguishing *Cooper v. Dupnik*, 963 F.2d 1220, 1248 (9th Cir. 1992) overruled on other grounds by *Chavez v. Martinez*, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (officers' techniques described as "sophisticated psychological torture" designed to "extract a confession" after "hours of mistreatment," and the "twentieth-century inquisitorial version of the Star Chamber" sufficient); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 811–12 (9th Cir. 2003) (persistent questioning of daughters about sexual abuse despite their denials and including threats that they could not leave until they confirmed abuse were not so coercive as to violate substantive due process); *Deshawn v. Safir*, 156 F.3d 340, 348 (2nd Cir. 1998) (deceptive, unprolonged interrogation in the absence of physical coercion, fear, torture or emotional or psychological overbearance of the defendant's will insufficient); *Smith v. Campbell*, 295 Fed. Appx. 314, 318-319 (11th Cir. 2008) (suspect who was excessively intoxicated at the outset of the interrogation, told she would not be able to check on her son until she confessed, denied her anti-anxiety medication, sleep-deprived, and never given food throughout the 6–8 hours of interrogation insufficient for a substantive due process violation); *Tinker v. Beasley*, 429 F.3d 1324, 1326 (11th Cir. 2005) (suspect's due process rights were not violated where the officers repeatedly interrogated the suspect over several days, told her that she would never see her children again unless she confessed and that she would be going to the electric chair, and falsely informed her that her lawyer had abandoned her). *See also Chavez*, 538 U.S. at 774-775 (three justices opined that a police officer's un-*Mirandized* coercive interrogation of a wounded man who was receiving medical treatment was not sufficiently egregious).

Finally, the lack of any "guideposts for responsible decisionmaking" in this area, and the Court's reluctance to expand the doctrine of substantive due process,  further counsel against recognizing a new "fundamental liberty interest" in this case.

In light of the above, the undersigned concludes that plaintiffs have failed to establish a violation of their Fourteenth Amendment substantive due process rights.

## F.  Commerce Clause

Plaintiffs also assert that Detective Gauthier's actions violated their rights under the Commerce Clause.  Without deciding whether the plaintiffs have asserted a claim for a violation of their Constitutional rights, this claim is best addressed under the second prong of the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

Under the circumstances of this case, it is plain that any right plaintiffs may have under the Commerce Clause was not clearly established at the time of the alleged events (nor is the alleged right clearly established now). While the United States Supreme Court has held that a violation of the Commerce Clause may be redressed by a § 1983 action[14], given that the Clause itself deals with Congress' and the State legislatures' power to regulate interstate commerce[15], Commerce Clause jurisprudence has focused on the regulatory and legislative powers of Congress and the States. *See e.g. United States v. Lopez*, 514 U.S. 549, 553-554, 115 S.Ct.

---

[14]*Dennis v. Higgins*, 498 U.S. 439, 111 S.Ct. 865 (1991).

[15]The Commerce Clause provides, as one of Congress' enumerated powers under Article I, § 8 of the Constitution "[t]o make all Laws which shall be necessary and proper for carrying into Execution", its authority "[t]o regulate Commerce with foreign Nations, and among the several States, and with Indian Tribes." U.S. Const. art. I, § 8, cl. 3.  The Clause has been interpreted as also limiting "the power of the States to erect barriers against interstate trade."  *Dennis*, 498 U.S. at 446.

1624 (1995) (holding that a law making it a federal offense to knowingly possess a firearm in a school zone exceeded Congress's commerce clause authority);  *Gonzales v. Raich*, 545 U.S. 1, 32, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (upholding restrictions on the "intrastate, noncommercial cultivation, possession and use of marijuana" under Congress's commerce clause power); *Wickard v. Filburn*, 317 U.S. 111, 128–29, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (establishing Congress's power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce);  *Dennis v. Higgins*, 498 U.S. 439, 448 and 450, 111 S.Ct. 865 (1991) (describing the Commerce Clause as "conferring a 'right' to engage in interstate trade free from restrictive state regulation" by imposing "limitations on state regulation of commerce" and, accordingly, finding that the Clause "is the source of a right of action in those injured by [state] regulations that exceed such limitations.");  *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979) (interpreting the Commerce Clause as "a restriction on permissible state regulation" of interstate commerce); *South-Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 87, 104 S.Ct. 2237, 2240, 81 L.Ed.2d 71 (1984) (noting that the Commerce Clause is a "limitation on the power of the States to enact laws imposing substantial burdens on such commerce"). Indeed, not a single case has been cited to this Court, nor has the Court's own research disclosed a single case, in which a claim under the Commerce Clause has been successfully asserted against a municipal police officer under § 1983 for law enforcement activities.

Given this total lack of jurisprudence, this Court simply cannot find that  Detective Gauthier's conduct violated a constitutional right which was clearly established.[16]  This is not to say that such claim does not exist or that such a claim cannot be brought under § 1983. Rather, as a matter of law, because the alleged unlawfulness of Detective Gauthier's conduct was not a clearly established violation of the Commerce Clause, such that every reasonable officer in Detective Gauthier's position would understand that what he is doing violated the Commerce Clause, Detective Gauthier is entitled to qualified immunity.

## G.  Claims Against Sheriff Theriot

Supervisory public officials cannot be held liable under § 1983 on any theory of vicarious liability.  Rather supervisory officials may be held liable on only two bases.  To be liable under §1983, a supervisory public official  must be either (1) personally involved in the act causing the alleged constitutional deprivation, or (2) must have implemented a policy so deficient that the policy itself acts as a deprivation of constitutional rights.  *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998); *Thompkins v. Belt*, 828 F.2d 298, 303-04 (5th Cir. 1987).

With respect to the first base, a supervisor may be held liable if there exists either personal involvement in the constitutional deprivation or a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  *Thompkins*, 828 F.2d at 304.

---

[16]This is so even if, as noted by the plaintiffs, Detective Gauthier himself was aware that crawfish caught in the Basin are sold in interstate commerce.  This "awareness" simply does not establish that Detective Gauthier or any other reasonable law enforcement officer would understand that confiscation of the plaintiffs' crawfish traps might in some way run afoul of the Commerce Clause.

Here, in support of their claim of the personal involvement of the Sheriff, plaintiffs submit a handwritten note generated by Major Sam Inzerella, as a result of a conversation Inzerella had with Sheriff Theriot after Mike Bienvenu of the crawfish producer's association had contacted the Sheriff.  The note states "call DA's office", "get a[n] opinion before citation is written" and further requests "a copy of a federal decision."  By discovery response, Sheriff Theriot has stated that he has no recollection of any conversation with Major Inzerella about the note or subjects mentioned therein.  Plaintiffs further submit the affidavit of their counsel, Gordon J. Schoeffler.  The affidavit states that on or about January 5, 2010, Schoeffler received a call from Sheriff Theriot in which he advised that there had been complaints of trespass in the Atchafalaya Basin and, accordingly, Sheriff Theriot requested a copy of this Court's decision in *Meche v. Richard*, 05-0385.

Viewing the evidence in the light most favorable to plaintiffs, the Court cannot find that Sheriff Theriot personally took part in the plaintiffs' alleged Constitutional deprivations, and, more specifically, that the Sheriff directly and personally participated in the complained of seizure of the plaintiffs' crawfish traps.  There is an absolute lack of evidence in the record establishing the Sheriff's personal knowledge of the location of the plaintiffs' traps or their alleged confiscation.  Rather, at best, the evidence suggests only that Sheriff Theriot may have had some general knowledge of complaints of trespassing involving crawfishing in the Atchafalaya Basin.  However, this general knowledge of trespassing complaints in the Atchafalaya Basin and the inquiry by the Sheriff about a federal decision in January 2010,

34

before the February 2010 theft and subsequent trespassing complaint regarding LaGrone and Whiskey Bay, is simply too attenuated to be causally connected to the plaintiffs' alleged illegal Fourth Amendment seizure of the plaintiffs' traps.

Further, even if there was a causal connection between the Sheriff 's general knowledge of trespassing complaints and the plaintiffs' claimed constitutional deprivations, Sheriff Theriot's actions were objectively reasonable.  Sheriff Theriot is therefore entitled to qualified immunity.  The note evidences that Sheriff Theriot's actions were entirely reasonable.  The Sheriff was attempting to obtain federal jurisprudence which he believed could assist in any charging decisions made by his department, and was attempting to get an opinion from the District Attorney on the legality of any such charging decisions.  Indeed, that is exactly what Detective Gauthier did before issuing citations to the plaintiffs herein, that is, obtaining jurisprudence and advice from Assistant District Attorney Louviere before charging the plaintiffs with trespass. Based on his own acts and the acts of his subordinate, Detective Gauthier, Sheriff Theriot is qualifiedly immune.  *See Thompson v. Upshire County,* 245 F.3d 447, 460-462 (5th Cir. 2001).

With respect to the second base for liability, even without personal involvement in the alleged constitutional deprivation, a supervisory official such as the Sheriff may be liable if: (1) the Sheriff failed to supervise or train the officer involved; (2) there is a causal connection between the failure to supervise or train and the violation of the plaintiff's rights; and (3) the failure to supervise or train constituted deliberate indifference to the plaintiff's constitutional

rights.  *Thompson,* 245 F.3d at 459;  *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005); *Mesa v. Prejean*, 543 F.3d 264, 274 (5th Cir. 2008).

A "plaintiff must allege with specificity how a particular training program is defective." *Roberts*, 397 F.3d at 293.   "Plaintiffs cannot prevail by styling their complaints about the specific injury suffered as a failure to train claim."  *Id. citing City of Canton*, 489 U.S. at 391, 109 S.Ct. at 1206.  Rather, the "connection must be more than a mere 'but for' coupling between cause and effect."  *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992) (citations omitted).

Moreover, "[p]roof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference."  *Thompson*, 245 F.3d at 459; *Mesa*, 543 F.3d at 274.   To prove deliberate indifference, a plaintiff must demonstrate "at least a pattern of similar violations arising from training that is so clearly inadequate as to be obviously likely to result in a constitutional violation."  *Roberts*, 397 F.3d at 292;  *Thompson*, 245 F.3d at 459.

In this case, the plaintiffs have failed to produce any evidence substantiating their general and conclusory allegations that their claimed constitutional violations resulted from a training or supervisory failure.  This is insufficient under *Roberts*.

Morever, plaintiffs have adduced no evidence demonstrating the requisite pattern of similar violations arising from inadequate training or supervision necessary to support a finding of deliberate indifference.  Plaintiffs assert that the fact that they each claim to have suffered identical constitutional deprivations is sufficient.  However, the record merely

establishes that a single officer (Detective Gauthier) engaged in the same conduct in a single

investigation.  That a particular officer may be unsatisfactorily trained or supervised does not

prove inadequacy in the Department and, accordingly, will not alone suffice to fasten liability

on the Sheriff.[17]  *Roberts*, 397 F.3d at 293-294 *citing Snyder v. Trepagnier*, 142 F.3d 791,

798-99 (5th  Cir. 1998) *quoting City of Canton*, 489 U.S. at 390-391, 109 S.Ct. at 1205-1206.

## II.  Official Capacity Claims

Plaintiffs have sued both Detective Gauthier and Sheriff Theriot in their official

capacities.  An official capacity suit is the equivalent of a suit against the entity of which the

officer is an agent.  *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Brandon v. Holt*, 469

U.S. 464, 471-472 (1985); *Hafer v. Melo*, 112 S.Ct. 358, 361 (1991); *McMillian v. Monroe*

*County, Ala.,* 520 U.S. 781, 784-85, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997)[18] ; *Burge v. St.*

*Tammany Parish,* 187 F.3d 452, 466 (5th Cir. 1999). Thus, such a claim requires *Monell* proof

_____

[17]The plaintiffs also point to the failure of the owners of the 63 unclaimed traps as evidence of a
pattern.  However, they offer no evidence in support of their speculative and conclusory allegations
which are obviously insufficient to defeat summary judgment.

[18]The Supreme Court in *McMillian* explained that:
> a suit against a governmental officer "in his official capacity" is the same
> as a suit " 'against [the] entity of which [the] officer is an agent,' "
> *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114
> (1985) *quoting  Monell v. New York City Dept. of Social Servs*., 436 U.S.
> 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611(1978) and that victory in
> such an "official-capacity" suit "imposes liability on the entity that [the
> officer] represents," *Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873,
> 83 L.Ed.2d 878 (1985).

*McMillian,* 520 U.S. at 785 n. 2, 117 S.Ct. 1734.

of an official policy[19] or custom[20] as the cause of the constitutional deprivation.  *Turner v. Houma Municipal Fire & Police Civil Service Board*, 229 F.3d 478, 483 fn. 10 (5th Cir. 2000) *citing Monell v. Department of Social Services*, 436 U.S. 658 (1978)[21];  *Campbell v. City of San Antonio*, 43 F.3d  973, 977 (5th Cir. 1995).

The standard applicable to an official capacity *Monell* claim against Sheriff Theriot is the same standard applicable to the plaintiffs' individual capacity supervisory claim against the Sheriff.  *See Roberts*, 397 F.3d at 293.  Accordingly, the plaintiffs' failure to establish an individual capacity supervisory claim against the Sheriff is fatal to their official capacity *Monell* claim.  Moreover, because, unlike Sheriff Theriot, Detective Gauthier is not an official policy maker, his acts cannot represent the municipal entity of which he is an agent.  Thus, because plaintiffs' claims against the Sheriff fail, the plaintiffs' official capacity claim against Detective Gauthier likewise fails.

---

[19]"An official policy, for purposes of §1983 liability, is '[a] policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority.'" *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) *quoting  Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*).

[20] Courts have defined custom as a "persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Campbell*, 43 F.3d at 977 *citing Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir.1984); *Matthias v. Bingley*, 906 F.2d 1047, 1054 (5th Cir. 1990) (*en banc*).

[21]In *Monell,* the Court held that local governmental entities may be sued under §1983.  However, they may not be held vicariously liable under the doctrine of *respondeat superior.*  Thus, a governmental entity may not be held liable merely because it employs a tortfeasor.  Liability must be based upon allegedly unconstitutional conduct which "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or is] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's decision making channels."  *Id*. at 690-91.

Finally, to the extent plaintiffs assert any official capacity claim against Detective Gauthier or Sheriff Theriot, when there is no underlying individual constitutional violation for which the municipal defendant can be held derivatively liable on the basis of its policies or customs, there can be no liability against the municipality or its employees in their official capacities. *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 528-529 (5th Cir. 1999); *Tejada v. Knee*, 228 F.3d 409, 2000 WL 1056124, *2 (5th Cir. 2000) (unpublished); *Breaux v. Brown,* 2006 WL 3760242, *2 (W.D. La. 2006); *Patin v. Richard*, 2011 WL 9118, *8 (W.D. La. 2011) *citing Ashford v. City of Lafayette*, 2008 WL 5157900, *11 (W.D. La.2008).

In this case, plaintiffs have failed to set forth a viable constitutional claim against Detective Gauthier or Sheriff Theriot in their individual capacities.  Thus, in the absence of any underlying constitutional claim, plaintiff cannot establish an official capacity claim against any defendant, as such a suit is tantamount to a suit against their municipal employer.[22]  *Id.* Accordingly, to the extent that plaintiff asserts any official capacity claim against Detective Gauthier or Sheriff Theriot, those claims are properly dismissed with prejudice.

## III.  Claims Asserted under § 1985

Plaintiffs also assert causes of action under § 1985, which provides a cause of action to any person injured as a result of a conspiracy to interfere with one's civil rights.  They do not assert under which sub-section of the statute they claim to proceed.  Plaintiffs, however, fail to present a cognizable claim under any subsection of the statute.

---

[22]*See also Kentucky v. Graham*, 473 U.S. 159 (1985), *Brandon v. Holt*, 469 U.S. 464 (1985), *Hafer v. Melo*, 112 S.Ct. 358 (1991), *McMillian v. Monroe County, Ala.,* 520 U.S. 781, 784-85, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997) and *Burge v. St. Tammany Parish,* 187 F.3d 452, 466 (5th Cir. 1999), *supra*.

Section 1985(1) relates only to officers of the United States, that is, federal officers. *Salmon v. Miller*, 951 F.Supp. 103, 106 (E.D. Tex. 1996) *citing  Kush v. Rutledge*, 460 U.S. 719, 724, 103 S.Ct. 1483, 1486 (1983).  Plaintiffs do not complain of the actions or inactions of any federal officer.  Accordingly, plaintiffs fail to state a claim under §1985(1).

Section 1985(2) consists of two parts: the first part proscribes conspiracies to interfere with the administration of justice in federal courts; the second part applies to conspiracies to obstruct the course of justice in state courts.  42 U.S.C. §1985(2).  *See Kush*, 103 S.Ct. at 1486-1487. The first part of  §1985(2) is inapplicable herein because plaintiffs do not complain of events in connection with federal court proceedings.  Under the second part of  §1985(2), aimed at state court proceedings, it is necessary to allege that the conspiracy was motivated by racial or other class-based discriminatory animus. *Kimble v. McDuffy, Inc*. 648 F.2d 340, 346 (5th Cir. 1981); *Kush*, 103 S.Ct. at 1485-1486; *Salmon*, 951 F.Supp. at 107 *citing Bradt v. Smith*, 634 F.2d 796, 801 (5th Cir. 1981); *Bryant v. Military Department of Mississippi*, 597 F.3d 678, 687 (5th Cir. 2010) *citing  Daigle v. Gulf State Utils. Co.*, 794 F.2d 974, 979 (5th Cir. 1986)*; Burrell v. Adkins*, 2007 WL 4699166, *14 (W.D. La. 2007).

Section 1985(3) prohibits conspiracies that interfere with the private enjoyment of "equal protection of the laws" and "equal privileges and immunities under the laws", as well as the right to support candidates in federal elections.  *See Kush*, 103 S.Ct. at 1486-1487.  The second part of this subsection is obviously inapplicable because plaintiffs do not complain of any federal election.

Claims under the first part of this subsection, like those asserted under the second part of § 1985(2) require that the conspiracy was motivated by racial or other class-based discriminatory animus.  *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790 (1971); *Salmon*, 951 F.Supp. at 107; *Bryant*, 597 F.3d at 687 *citing  Daigle*, 794 F.2d at 979; *Lockett v. New Orleans City*, 607 F.3d 992, 1002 (5th Cir. 2010);  *Burns–Toole v. Byrne*, 11 F.3d 1270, 1276 (5th Cir.), *cert. denied*, 512 U.S. 1207, 114 S.Ct. 2680, 129 L.Ed.2d 814 (1994); *Burrell*, 2007 WL4699166, at *14 *citing  United Brotherhood of Carpenters & Joiners of America v. Scott*, 463 U.S. 825, 928-829, 103 S.Ct. 3352, 3355-3357 (1983) and *Hilliard v. Ferguson*, 30 F.3d 649, 652-653 (5th Cir. 1994); *see also Kush*, 103 S.Ct. at 1487.

As is the case with plaintiffs' Equal Protection claim, plaintiffs have not alleged or shown a conspiracy motivated by any racial or class-based discriminatory animus. Accordingly, they have no cognizable claim under the second part of § 1985(2) or first part of § 1985(3).

## IV.  Louisiana State Law Claims

In light of the above, it is the recommendation of the undersigned that all federal claims asserted against Detective Gauthier and Sheriff Theriot be dismissed.  If that recommendatiuon is adopted, no federal question would remain before this Court.

A district court may decline to exercise supplemental jurisdiction if the court has dismissed all claims over which it had original jurisdiction.  28 U.S.C. § 1367(c)(3); *Nowell v. Acadian Ambulance Service*, 147 F.Supp.2d 495, 510 (W.D. La. 2001).  Indeed, when a court

41

dismisses all federal claims before trial, the general rule is to dismiss any pendent claims.  *Bass v. Parkwood Hospital*, 180 F.3d 234, 246 (5th Cir. 1999) *citing Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989).  However, the dismissal should be without prejudice.  *Id*.  Accordingly, while the defendants seek a merits dismissal of the plaintiffs' State law claims, the undersigned recommends that this Court decline supplemental jurisdiction over the State law claims asserted by plaintiffs, and that those claims be dismissed without prejudice.

## CONCLUSION

For the reasons stated above, **IT IS RECOMMENDED** the defendants' Motions for Summary Judgment be **GRANTED in part**.  Accordingly, **IT IS RECOMMENDED** that all federal claims asserted by Ronald J. Vicknair, Jr.  and Bernard Blanchard against Sheriff Ronald J. Theriot and Detective Gabriel Gauthier be **DISMISSED WITH PREJUDICE**.  **IT IS FURTHER RECOMMENDED** that  all state law claims asserted by  Ronald J. Vicknair, Jr.  and Bernard Blanchard against Sheriff Ronald J. Theriot and Detective Gabriel Gauthier be **DISMISSED WITHOUT PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the clerk of court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

**Failure to file written objections to the proposed factual finding and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglas v. United Services Automobile Association,* 79 F.3d 1415 (5th Cir. 1996).**

A courtesy copy of any objections or responses shall be provided to the District Judge at the time of filing.

Signed this 28th day of January, 2013, at Lafayette, Louisiana.


C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  1-29-2013
By:  MBD

43